**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. SAG-19-0479** |
| **DEVIN GALLAGHER,** | |
| **Defendant.** | |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT DEVIN GALLAGHER'S PRETRIAL DETENTION**

The United States of America, by and through its undersigned counsel, submits this Memorandum in Support of defendant Devin Gallagher's pretrial detention and in opposition to his request to be released pending trial.  Gallagher is a drug-trafficker with at least three prior convictions for possession with intent to distribute narcotics, and was in possession of a firearm, rendering him an Armed Career Criminal and a Career Offender.  Under the Bail Reform Act, armed recidivist drug dealers are not candidates for release and, therefore, Gallagher's motion seeking his release should be denied.  Moreover, Gallagher cannot rebut the presumption that there are no conditions or combination of conditions of release that reasonably assure the safety of the community.  In addition, Gallagher's argument that COVID-19 is a changed circumstance meriting release is contrary to the circumstances and procedures in place at the Chesapeake Detention Facility to minimize the spread of the COVID-19 virus and ensure the safety of inmates. Accordingly, this Court should detain Gallagher and deny his request for release.

**BACKGROUND**

Defendant Gallagher is the sole defendant in a three-count indictment filed on October 3, 2019, charging him with possession with intent to distribute marijuana and delta-nine-

1

tetrahydrocannabinol ("THC"), in violation of 21 U.S.C. § 841(a)(1); possession of a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c); and possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(1).   Gallagher had his initial appearance in federal court on October 31, 2019, and during the court proceeding he consented to detention.  (ECF No. 7).

On March 23, 2020, Gallagher filed a motion for release from custody.  (ECF No. 11).  A detention hearing was held on April 13, 2020.  During the detention hearing, the Government presented substantial evidence as to why defendant Gallagher is a danger to the community, risk of flight, and why he cannot rebut the presumption of detention, including: (1) the strong evidence against Gallagher on the current charges; (2) his criminal record, including three prior convictions for drug distribution crimes; (3) his poor performance while under court supervision; and (4) his removal of electronic monitoring equipment and flight after learning of the federal charges against him.  At the conclusion of the hearing, the Court detained Gallagher, finding that no release condition or combination of conditions would reasonably assure either the safety of any other person and the community.  ECF No. 14.

On May 6, 2020, the defendant filed a second motion for review of detention order.  ECF No. 15.  Gallagher's only argument in favor of release was speculation regarding COVID-19. Following a hearing on Gallagher's second motion on May 15, 2020, United States Magistrate Judge Deborah L. Boardman reversed her prior order of detention and set conditions of release. ECF Nos. 21 and 22.  As discussed more fully below, Gallagher should be detained pending trial.

**ARGUMENT**

## I.     Legal Standard

This is a case wherein the Government may seek detention.  18 U.S.C. § 3142(f)(1)(D)-(E).  The District Court reviews detention decisions *de novo*.  *United States v. Stewart*, 19 Fed. App'x 46, 47 (4th Cir. 2001).  Here, the Government is seeking detention because Gallagher poses a danger to the community and is a risk of flight.  In evaluating whether Gallagher should be detained, the Court should consider the factors set forth in 18 U.S.C. § 3142(g).  These factors include: "(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . a controlled substance [or] firearm; (2) the weight of the evidence against the person; (3) the history and characteristics of the person . . . ; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release."  18 U.S.C. § 3142(g).  Because of the nature of the charges against Gallagher, the Government also is entitled to a presumption that no combination of release conditions will reasonably assure his appearance and the safety of the community.  *See* 18 U.S.C. § 3142(e)(3)(A). Just as Gallagher could not rebut the presumption during the April 13, 2020 detention hearing, there has not been any change in circumstances that would allow him to do so now.

In this case, an examination of the § 3142 factors establishes that Gallagher should remain detained pending trial:

### A.     The Nature and Circumstances of the Offenses

In April 2019, a confidential informant informed the Anne Arundel County Police Department that defendant Gallagher was selling large quantities of marijuana in the Cape St. Clair area of Annapolis, Maryland.  On April 25, 2019, detectives conducted surveillance of Gallagher and saw him exit a black Chevrolet Impala at 570 Bellerive Road, which is an apartment complex in Annapolis.  Detectives observed Gallagher enter the black Chevrolet Impala with a backpack.

Gallagher then drove to a back parking lot of the apartment complex.  On April 30, 2019, a K-9 scan of Gallagher's black Chevrolet resulted in a positive alert for controlled dangerous substances.

On May 1, 2019, detectives installed a court-authorized GPS tracking unit on Gallagher's black Impala.  Detectives observed Gallagher park the vehicle in the back parking lot of the apartment complex located at 570 Bellerive Road.  Gallagher walked from the back parking lot with a white duffel bag and entered Apartment #143 located at 570 Bellerive Road.

On May 3, 2019, law enforcement agents set-up surveillance of a white van with a West Virginia dealer tag parked at 582 Bellerive Road.  Detectives knew that the West Virginia dealer tag was associated with Gallagher because he had been stopped previously in two different vehicles displaying the tag.  Based on GPS tracking and surveillance, detectives observed Gallagher enter the parking lot at 582 Bellerive Road and park behind the white van.  Gallagher exited his black Chevrolet Impala, approached the van, and unlocked the van's rear doors. Gallagher then removed two large boxes and placed them in his black Impala.  Gallagher also retrieved a backpack from the van.

On May 7, 2019, detectives conducted a K-9 scan of the white van with the West Virginia dealer tag.  The van was parked in middle of a parking lot across from 570 Bellerive Road.  During the scan, a K-9 dog alerted for the positive presence of a controlled dangerous substance inside of the van.  Later that day, Gallagher was followed to SunTrust Bank where he made a cash deposit. Gallagher then drove to an Xfinity store located at 2077 Somerville Road in Annapolis.  Detectives knew that Gallagher previously attempted to mail a package (an Xfinity box containing a black cable, Xfinity paperwork, and $7,500 in U.S. currency in a heat-sealed plastic bag wrapped in aluminum foil and saw dust) from the Xfinity store.  Gallagher then went to a Wells Fargo bank

4

and deposited U.S. currency.  The GPS tracking device showed that Gallagher went back to 570 Bellerive Road.  Surveillance was set-up at the white van parked at 582 Bellerive Road.  During mid-afternoon, Gallagher arrived at 582 Bellerive and parked behind the van.  Gallagher unlocked the rear door of the van, removed a brown bag, and handed it to a passenger in Gallagher's black Chevrolet Impala.  Gallagher locked the van and the two men drove away.  Gallagher was then observed at 570 Bellerive unloading a large box from his vehicle.  Gallagher took the box to his apartment (#143).

On May 9, 2019, detectives conducted a K-9 scan of the front door area of Apartment 143 at 570 Bellerive Road, resulting in a positive alert for a controlled dangerous substance.  The K-9 then had a positive alert for a controlled dangerous substance at Gallagher's vehicle, which was parked near the rear parking lot of 570 Bellerive Road.

On May 9, 2019, detectives executed search warrants at Gallagher's residence located at 570 Bellerive Road, Apt. 143, and his two vehicles: the Chevrolet Impala and the white van. Search of the white van yielded approximately two kilograms of marijuana; approximately 6,000 grams (net) of THC cartridges; an unloaded .40 caliber Smith & Wesson handgun; a .40 caliber magazine containing eight rounds; and documents in Gallagher's name, among other things. Search of the Chevrolet Impala yielded $4,300 in U.S. currency; 172 grams (net) of THC cartridges; and documents in Gallagher's name.  The search of Gallagher's residence resulted in the seizure of approximately $40,000 in U.S. currency; a small amount of marijuana; drug packaging paraphernalia; and paperwork in Gallagher's name.

All of this evidence demonstrates that Gallagher is an armed drug dealer and a clear and profound danger to the community.  For purposes of the bail statute, the concept of dangerousness includes "the danger that the defendant might engage in criminal activity to the detriment of the

community." *United States v. Millan*, 4 F.3d 1038, 1048 (2d Cir. 1993). Notably, danger to the community includes "the harm to society caused by (the likelihood of continued) narcotics trafficking." *United States v. Leon*, 766 F.2d 77, 81 (2d Cir. 1985); *see also United States v. Stone*, 608 F.3d 939 (6th Cir. 2010); *United States v. Hare*, 873 F.2d 796, 798–99 (5th Cir. 1989) (courts may consider the legislative finding by Congress that those who commit drug-trafficking offenses pose a special risk of flight and a special danger to the community); *United States v. Townsend*, No. 1:10MJ90–1, 2010 WL 2607144 *2 (M.D.N.C. June 25, 2010) (discussing the "statutorily-mandated importance" of those offenses explicitly identified by Congress in 18 U.S.C. § 3142(g)(1), including controlled substance offenses).

### B.     Weight of the Evidence

Detectives and investigators took multiple enforcement actions directed at Gallagher. As discussed above, officers surveilled Gallagher, tracked his movements via court-authorized tracking methods, and then seized substantial quantities of narcotics, a firearm, and a large sum of U.S. currency from Gallagher's vehicles and residence. Indeed, at least one court has suggested that the weight of the evidence is "one of the most important factors to consider." *See United States v. English*, 629 F.3d 311, 317 (2nd Cir. 2011) (reciting district court's basis for detention, which had rejected defense counsel's suggestion that the weight of the evidence was "not an important factor").

As a result of the above-described investigation, the evidence against Gallagher is strong. *See United States v. Dyer*, No. 5:13-CR-00107, 2013 WL 2898324, at *2 (S.D.W. Va. June 13, 2013) (ordering detention where evidence in "presumption" narcotics case was "strong"); *see also United States v. Boyd*, 29 F. Supp. 3d 658, 661 (E.D.N.C. 2014) (ordering detention in part because the weight of the evidence against the defendant was "compelling"). This particular evidence

weighs heavily in favor of defendant Gallagher's pre-trial detention. *See* 18 U.S.C. § 3142(g)(1) and (2).

### C.    History and Characteristics of the Person

Gallagher has a remarkable criminal record and a history of poor adjustment to court supervision.  Gallagher is 28 years old.  Since turning age 18, he has amassed <u>seven</u> adult criminal convictions.  His criminal convictions are as follows:

2010 -  Theft (Circuit Court for Anne Arundel County, case no. 02-K-10-000049);

2010 -  Possession with Intent to Distribute Narcotics (Circuit Court for Anne Arundel County, case no. 02-K-10-00159);

2010 -  Controlled Dangerous Substance: Obtain by Fraud (Circuit Court for Anne Arundel County, case no. 02-K-10-002106);

2012 -  Theft (District Court for Anne Arundel County, case no. 3A00248811);

2012 -  Controlled Dangerous Substance: Possess Paraphernalia (District Court for Anne Arundel County, case no. 1A00250216);

2013 -  Possession with Intent to Distribute Narcotics (Circuit Court for Baltimore County, case no. 03-K-13-004977);

2013 -  Possession with Intent to Distribute Narcotics (Circuit Court for Talbot County, case no. 20-K-13-010550).

Gallagher is charged in Count Three of the Indictment with Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. § 922(g).  ECF No. 1.  Because Gallagher has three prior convictions for serious drug offenses, he is an Armed Career Criminal pursuant to 18 U.S.C. § 924(e), and is subject to a 15-year mandatory minimum sentence.  In addition, Gallagher is charged with Possession with Intent to Distribute Controlled Dangerous Substances, in violation of 21 U.S.C. § 841(a).  *Id.*  Gallagher has incurred at least two prior convictions for controlled substances offenses and, therefore, is a Career Offender.  *See* U.S.S.G. § 4B1.1(a).  Because Gallagher was charged with Possession of a Firearm in Furtherance of a Drug-Trafficking Crime,

in violation of 18 U.S.C. § 924(c), ECF No. 1, his advisory Guidelines range is 360 months – life. U.S.S.G. § 4B1.1(c)(3).

Moreover, as noted in the Pretrial Services Report, Gallagher violated the terms and conditions of his court supervision in <u>every</u> conviction/sentence that he has incurred.  Moreover, he currently has violation of supervision matters pending against him in two cases: case no. 03-K-13-004977 in the Circuit Court for Baltimore County; and case no. 20-K-13-010550 in the Circuit Court for Talbot County.

Gallagher also has other charges pending against him in the Circuit Court for Talbot County, case no.  C-20-CR-19-00187.  In that matter, Gallagher is charged with motor vehicle and drug possession charges, including Exceeding Posted Maximum Speed Limit; Driving Vehicle While So Far Impaired by Drugs/Cannot Drive Safely; Driving Vehicle While Impaired by a Controlled Dangerous Substance; and Controlled Dangerous Substance Possession – Not Marijuana.

Gallagher was also charged in October 2019, with Escape – 2nd Degree in the Anne Arundel County Circuit Court, case no. D-07-CR-19-0125539.  The facts surrounding this matter are related to his removal of an electronic monitoring device when he learned of the federal charges pending against him, as discussed more fully below.

Per the Pretrial Services Report, Gallagher also has a history of mental health disorders and substance abuse.

It is clear from Gallagher's record that the he has been undeterred by his prior criminal adjudications, escalating to a larger-scale of drug trafficking and possession of a firearm. Gallagher has a troubling record while under supervision, violating the terms and conditions of his court supervision in every case where he was convicted.  Moreover, Gallagher has a terrible history

and record of committing criminal offenses while under court supervision, including the current charges. Such conduct should weigh heavily in favor of detention.

**D.      The Nature and Seriousness of the Danger to the Community in the Event of the Defendant's Release**

Gallagher is undisputedly a recidivist. He has not stopped, nor will he stop, dealing drugs. He will not comply with court-ordered supervision. If he were placed on location monitoring, there is little to stop him from continuing his drug business or deciding to flee. A substantial risk therefore exists that in the event of Gallagher's release he would continue participate in the drug-trafficking business.

**E.      Risk of Flight**

The Bail Reform Act also allows the court to order detention if a defendant poses a serious risk of flight. 18 U.S.C. § 3142(f). In this case, federal charges were returned against Gallagher on October 10, 2019. ECF No. 1. At that time, Gallagher was under "No Bond House Arrest" status with the Anne Arundel County Department of Detention Facilities ("DDF"). *See* Letter from Anne Arundel County Department of Detention Facilities, attached hereto as Exhibit 1. On October 10, 2019, Gallagher was contacted by the DDF and informed of the federal charges and arrest warrant. Gallagher was instructed to report immediately to the Ordnance Road Correctional Facility. Ex. 1. Later that day, the DDF received an alert indicating a strap tamper of Gallagher's GPS ankle monitoring system. Ex. 1. Gallagher removed his monitoring ankle-bracelet, without authorization, and went to California – all while knowing that there was a federal arrest warrant pending. He finally returned to Maryland and self-surrendered on October 31, 2019. Based on this conduct, Gallagher poses an obvious risk of flight.

In addition, as discussed above, the Court can and should properly consider that Gallagher faces a guidelines range of 360-life based on his status as a Career Offender with an associated

charge under 18 U.S.C. 924(c).  *See* U.S.S.G. § 4B1.1(c)(3).  In addition, based on Gallagher's previous convictions, he also faces a mandatory minimum sentence of 15 years because his prior convictions will likely qualify him as an Armed Career Criminal under the Armed Career Criminal Act, 18 U.S.C. § 924(e).  Given the significant sentence to which Gallagher is exposed, his risk of flight is real and should be considered by the Court.  Gallagher may also be exposed to additional sentences at the state level given his multiple violations of supervision and pending charges.  Thus, placing Gallagher on electronic home monitoring is not a prudent course of action given his poor record of performance while under supervision, the steep sentence that he faces on the federal charges, the possibility of receiving consecutive sentences in the state matters, and record of tampering with electronic monitoring equipment and flight while under supervision.

### III.    Officials Have Established Comprehensive Health Measures at CDF to Avoid a COVID-19 Outbreak.

Gallagher does not contest the analysis under § 3142 and whether he poses a danger to the community and is a flight risk; rather, he focuses instead on the health risks posed by the COVID-19 outbreak.  The defendant relies on the prospect of a mass COVID-19 outbreak at the Correction Detention Facility ("CDF") in Baltimore, where the defendant is currently housed.  To date, there has been only a single documented case of COVID-19 among inmates at the facility, and that case involved an individual who had contracted COVID-19 prior to arrival at CDF, and who was found to be positive during intake and placed into isolation thereafter.[1]  There is no indication of any spread of COVID-19 at CDF.

---

[1]  That single inmate arrived at CDF on May 8, 2020, underwent a medical examination, and was placed into the intake quarantine unit, per DPSCS guidelines.  He remained there until May 11, 2020, at which point he developed a cough and fever, and was transferred to an isolation unit separate from other detainee housing.  On May 13, 2020, testing confirmed that the detainee had COVID-19, and he will now remain in the isolation unit until he is medically cleared.  There is no

While the Bail Reform Act instructs courts to consider the "physical and mental health" of the defendant as one of the factors in its analysis, 18 U.S.C. § 3142(g)(3)(A), that factor does not weigh heavily, if at all, in favor of Gallagher's release.  Currently, there has only been one case of COVID-19 at CDF in the detainee population.  Gallagher does not have COVID-19, and he does not allege that he has been exposed to any individuals with COVID-19.  In this way, he is not seeking release based on his *actual* "physical and mental health."  Instead he relies solely on the *possibility* of becoming infected.  He also argues that the few cases of COVID-19 at CDF create a material change in circumstances since the time of his detention order on April 13, 2020.  This Court has recently denied similar claims by detainees housed in the Chesapeake Detention Facility.[2]

---

reason to believe, as of this writing, that there has been any COVID-19 exposure beyond that intake quarantine area, and any staff or detainees who came into contact with the positive detainee were wearing appropriate protective equipment.  The government will continue to receive information from DPSCS on this issue.

There have also been, as of May 18, 2020, five reported cases of CDF staff testing positive for COVID-19, but no indication that the illness has spread from those individuals to other staff or to any inmates.  The most recent staff cases have involved a dentist who tested positive on May 14, 2020, but had last been at work on May 4, 2020; a correctional officer who tested positive for COVID-19 on May 5, 2020, but had last been at work on April 24, 2020; and a contract nurse who tested positive on May 2, 2020 and had last been at work on April 26, 2020.

[2] *See, e.g., United States v. Martin*, PWG-19-140 (D. Md. Mar. 3, 2020), ECF 209 (Order by Judge Grimm); *United States v. Blue,* ELH-19-0286 (D. Md. Mar. 31, 2020), ECF 413 (Order by Magistrate Judge Gesner); *United States v. Ashley,* RDB-06-0034 (D. Md. Apr. 6, 2020), ECF 107 (Order by Judge Bennett); *United States v. Jones*, RDB-18-0339 (D. Md. Apr. 17, 2020), ECF 588 (Order by Judge Bennett); *United States v. Gollahon*, DKC-19-257 (D. Md) (Order by Magistrate Judge Copperthite), ECF No. 85; *United States v. Hackett*, GLR-18-0086 (D. Md) (Order by Judge Russell), ECF No. 144; *United States v. Crosby*, ELH-19-268 (D. Md) (Order by Magistrate Judge Copperthite), ECF No. 415; *United State v. Gallagher*, SAG-19-479 (D. Md.) (Order by Magistrate Judge Boardman), ECF No. 14; *United States v. Anderson*, ELH-19-302 (D. Md.)(Order by Judge Hollander), ECF No. 79; *United States v. Hill*, TDC-20-046 (D. Md.) (Order by Magistrate Judge Copperthite), ECF No. 144; *United States v. Legard*, PWG-19-0137 (D. Md.) (Order by Judge Grimm) ECF No. 520; *United States v. Ellison*, ELH-19-286 (D. Md.) (Order by Judge

Moreover, as discussed below, CDF has implemented substantial precautionary measures to mitigate the risk of inmates being exposed to the COVID-19 virus.[3]

**A.    Comprehensive Precautionary Measures Have Been Instituted at CDF to Avoid a COVID-19 Outbreak.**

The Maryland Department of Public Safety and Correctional Services ("DPSCS") has established a comprehensive set of precautionary measures to limit the risk of COVID-19 transmission into and inside CDF.[4]   DPSCS represents that it is committed to providing all necessary precautionary measures and supportive therapies to avoid an outbreak of COVID-19, including taking all of the preventative actions advised by the Centers for Disease Control and Prevention ("CDC") and Maryland Department of Health ("MDH") regarding the disease.

DPSCS officials have substantial experience ensuring that viral outbreaks do not occur at their facilities.  They recognize the unique threat posed by the transmission of viruses inside a jail, and longstanding policies and procedures already exist to ensure an outbreak does not occur of many serious diseases, such as HIV/AIDS, MRSA, sexually transmitted diseases, viral hepatitis, tuberculosis, and seasonal influenza.  When faced with the potential for transmission of other notable viruses in recent history—such as, Avian Influenza (i.e., bird flu), H1N1, Severe Acute

---

Copperthite), ECF No. 427; *United States v. Waller*, GLR-19-86 (D. Md.) (Order by Judge Russell), ECF No. 143; *United States v. Solomon*, ELH-10-286 (D. Md.) (Order by Magistrate Judge Copperthite), ECF 454.

[3] The following individuals have provided information about the health measures that have been established at CDF: (1) Gary McLhinney, DPSCS Assistant Secretary; (2) Sharon Baucom, DPSCS Director of Clinical Services; (3) Sterling Johnson, Supervisors, USMS for the District of Maryland; (4) DPSCS Lieutenant Nina Riser; and (5) Jessica Dempsey, DPSCS Director of Nursing, Occupational Health, and Safety.

[4] Although CDF is a facility for federal pre-trial detainees, it is managed by DPSCS pursuant to a contract with the USMS.

Respiratory Syndrome (i.e., SARS), and Ebola—DPSCS facilities, including CDF, did not suffer any outbreaks.

That being said, DPSCS recognizes that COVID-19 carries an increased risk of transmission; that COVID-19 carries a higher fatality rate than many other viruses; and that the COVID-19 situation has resulted in a state of emergency.  Accordingly, DPSCS has employed the following measures at CDF:[5]

- *Social Visitation*.  DPSCS has placed a temporary hold on all social visits, such as visits from friends and family, as well as all outside programming, to limit the number of people entering CDF and interacting with detainees.[6]  Defense attorneys are still permitted to visit their clients in person; however, attorneys and detainees are separated by a glass wall and communicate with each other through the use of a telephone.  Two nurses are stationed at the entrance of CDF to ask the standard COVID-19-related health questions and take temperatures of anyone who enters the facility.  Moreover, as a practical matter, virtually all attorney-client communications occur via teleconference.

- *Detainees Entering the Facility*.  Unlike many of DPSCS's facilities, which are needed to house the constant influx of new state arrestees, CDF houses federal detainees and, at this time, few federal detainees are entering CDF.  The only new detainees entering CDF are a limited number of new federal arrestees who present a particular safety risk to the community.  CDF, moreover, is not receiving any new detainees from other DPSCS facilities.[7]

- *Screening Procedures*.  In the few instances in which a new detainee enters CDF, the detainee will be housed in an intake facility for 14 days, where within two hours of arrival, the detainee will be screened by medical professionals for coronavirus symptoms and exposure risk factors before being placed in the general population.  The detainee will also be screened by a medical professional a second time following the detainee's arrival.

---

[5] Because the health situation is rapidly evolving, new policies and procedures at CDF are constantly being implemented.

[6] Due to the hardship this poses, DPSCS has given each detainee five free telephone calls per week to ensure that each detainee is able to remain in contact with friends and family members.  DPSCS is also in the process of implementing social visits via video conference.

[7] As discussed above, a single inmate was identified as COVID-19 positive upon entry at CDF, and was placed into quarantine.

- *Detainees 50 Years of Age or More.*  Detainees who are 50 years of age or more are now being housed in a separate unit. In addition, the medical staff is taking temperature readings of such detainees three times a day. Detainees who are 50 years of age or more in the Protective Custody Unit are remaining in the Protective Custody unit; however, the medical staff is taking three temperature readings a day for such detainees.

- *Detainee Movement.*  The Court's Standing Order 2020-07, issued April 10, 2020, postponed all criminal trials and non-emergency proceedings scheduled to commence through June 5, 2020.  This means that detainees will not need to leave CDF during this period for any court appearances, except for emergencies.  In the event that a detainee has a court appearance, he will be screened for symptoms before entering the transport van and, upon reaching the courthouse, his temperature will be taken twice via a forehead thermal reader to ensure he does not have a fever.  To further avoid the possibility of exposure, the USMS has issued a prohibition on prisoner transfers to the courthouse or elsewhere for proffers, including a prohibition on agent transport writs and Chief Judge Bredar memorandum requests that would permit agents to pick up prisoners from a facility.

- *Sanitation and Hygiene*.  Each detainee is in possession of his own supply of soap to wash his hands at any time throughout the day.  Moreover, CDF recently completed a $1.1 million shower renovation, as a result of which detainees may shower whenever they wish. Signs and hand sanitizer have been posted throughout the facility, educating detainees and correctional officers about proper hygiene and encouraging them to wash their hands frequently.  The Secretary of DPSCS also has ordered that all facilities, including CDF, increase surface cleaning.  In addition to paid sanitation employees, CDF has trained a group of detainees whose full time job is constantly to disinfect and clean all surfaces that could be touched.  DPSCS also is producing substantial quantities of sanitizer at a facility in Hagerstown, to ensure that it has an adequate supply.  Finally, and importantly, each Correctional Officer has received a sneeze guard (protective mask), and are required to wear it at all times.  Each detainee has also received his/her own sneeze guard.

- *Quarantine*.  DPSCS is following the CDC guidelines regarding testing for COVID-19 and isolation of individuals with symptoms and/or risk exposure factors.  If a detainee exhibits flu-like symptoms or presents risk exposure factors, designated cells in a remote part of CDF have been set aside to serve as a quarantine area, where medical professionals can monitor those detainees.  Across the street from CDF is a DPSCS facility with "negative pressure rooms," where the ventilation is designed to avoid re-circulating air into the general population to limit the possibility of cross-contamination from room to room.

- *Correctional Officers*.  Although correctional officers will need to enter and re-enter the facility, they have received multiple mandatory trainings over the past week about how to mitigate the risk of exposing detainees to the disease.  Correctional officers have been ordered to stay home if they have any symptoms of the disease, and advanced paid leave

will be provided for any employees who have not accrued sufficient paid leave, to disincentive sick employees from coming to work to avoid loss of pay.

Finally, in order to ensure that the Court remains apprised of these and other precautionary measures, the USMS has been in contact with Chief Judge Bredar to respond to any inquiries regarding conditions at CDF and the measures being taken in response to the COVID-19 situation.

Along with the above, DPSCS has issued a series of memoranda, directives, and notices of standard operating procedures to limit any spread of the COVID-19 virus in its facilities, including the Chesapeake Detention Facility.  A series of such directives are attached to this memorandum, and state as follows:

- Information Bulletin dated March 9, 2020 announces general COVID-19 preventative measures provided to CDF inmates.  It provides for and outlines an increase in cleaning efforts.  It also informs inmates of the cleaning precautions they can take to prevent the spread of the virus.  The bulletin also advises inmates to let staff know if they feel sick or have cold or flu-like symptoms (attached as Exhibit 2).

- Information Bulletin dated March 9, 2020 announces general COVID-19 preventative measures provided to CDF staff.  It provides information about how the staff will increase cleaning efforts.  It also informs staff of the cleaning precautions they can take to prevent the spread of the virus and indicates that it is to be read during roll call for ten consecutive days and posted for all staff to view.  The bulletin also instructed staff to report sickness or cold or flu-like symptoms (Exhibit 3).

- Information Bulletin dated March 12, 2020 directs all staff, vendors and contractors to use hand sanitizer upon entry and at various points in the facility (Exhibit 4).

- Memorandum dated March 18, 2020 announces the emergency suspension of medical fees (Exhibit 5).

- SOP dated March 21, 2020 (Exhibit 6) establishes measures for transporting an infectious or potentially infectious inmate.  The SOP advises staff of the need to perform proper hygiene on themselves; states the need to ensure an inmate has done the same; lists steps to take to ensure proper ventilation in a transport vehicle; and identifies cleaning measures to take after transport.

- SOP dated March 25, 2020 (Exhibit 7) provides for isolation and quarantine areas, and states the procedures applicable to those locations.  The SOP states that housing unit officers must ensure rooms have signage with information on respiratory infection isolation room precautions, PPE donning and doffing, and droplet precaution.  The SOP provides

for an isolation room, the doors to which should remain closed. Medical equipment like blood pressure cuffs and thermometers are inside the room. The SOP states measures that must be taken to keep isolation area clean. The SOP also, of course, provides that inmates must stay in the group, isolation area, or quarantine area assigned to them.

- SOP dated March 31, 2020 (Exhibit 8) addresses the use of PPE, and implements policies for quarantine and isolation. The SOP provides for employee entry procedures such as temperature check, interview, and PPE; screening procedures for incoming inmates such as temperature check and PPE; quarantine procedures for asymptomatic inmates including quarantine if identified as having been exposed and wearing mask for fourteen days; and procedures for insolation of inmates who have tested positive for COVID-19 or are suspected of having COVD-19.

- Memorandum dated April 4, 2020 (Exhibit 9) establishes return to work procedures. Per the policy, staff who have self-quarantined should return to work within 72 hours if they are not exhibiting symptoms. Staff under observation for COVID-19 shall continue to work while wearing PPE and conduct regular temperature checks.

- Memorandum dated April 7, 2020 directs all staff to wear face shields, gloves and mask at all times (Exhibit 10). The memorandum also directs the provision of such PPE, and also provides guidance on PPE maintenance.

- Information Bulletin dated April 10, 2020 directs that detainees maintain a social distance of six feet, wash hands, wipe down areas in the housing unit, and sleep head to foot to increase distance between cellmates (Exhibit 11).

- Memorandum dated April 20, 2020 gave instructions on shortening beard length for effective use of Personal Protective Equipment ("PPE") (Exhibit 12).

- Memorandum dated April 22, 2020 sets the Standard Operating Procedures for the Environmental Compliance Safety Officers (Exhibit 13). The SOP helps the ECSOs ensure temperature checks for each person that enters the facility; screening questions asked at points of entry; provision of PPE to staff members; social distancing for inmates, with no more than 10 inmates in an area at a time; maintenance of 6-foot separation between inmates and staff; use of PPE by medical staff; and issuance of face masks to inmates.

- Memorandum dated April 23, 2020 provided for release procedures in light of COVID-19 (Exhibit 14).

- Memorandum dated April 27, 2020 provides notice that staff will be offered an N95 mask for use instead of face masks or sneeze guards outside of mandated isolation areas where N95 masks are required (Exhibit 15).

- Directive dated April 29, 2020 establishes procedures governing administrative segregation housing and discipline during the COVID-19 situation (Exhibit 16).

Essentially, the policy calls for the facilities to take into consideration the COVID-19 situation and health concerns before moving an inmate to a different cell.

Records provided by CDF also reflect that the facility is making efforts to implement the aforementioned policies.  An inspection was conducted at CDF, and the inspection reports indicate that CDF is taking reasonable, appropriate precautions and is making a reasonable effort to implement the COVID-19 policies discussed above.  Specifically, the CDF audit (Exhibit 17) found, among other things, that the facility was properly screening individuals entering the facility, staff were maintaining appropriate social distancing, and that staff were making use of PPE.  The Environmental Compliance Safety Officer (ESCO) walk-through audit (Exhibit 18) reported that the facility has appropriate signage throughout the facility, staff were appropriately using PPE, cleaning supplies were available, and social distancing was being maintained.   The Intelligence and Investigation Division audit (Exhibit 19), likewise, found that staff members were appropriately using PPE, social distancing guidelines were being followed, and individuals entering the facility were being appropriately being screened.

In addition, on April 30, 2020, Johnny L. Hughes, the United States Marshal for the District of Maryland, provided a letter to the Federal Public Defender James Wyda in response to his correspondence regarding prisoners held in pre-trial detention.  A copy of the letter is attached as Exhibit 20.  As a general overview, Mr. Hughes provided the following information:

- There are currently 282 pre-trial prisoners at CDF
- Marvin Brickham, who works for the United States Marshals Service ("USMS") as a federal monitor, has advised:
    - Corizon Health, a contractor for DPSCS has issued Clinical Guidelines for addressing and responding to COVID-19 in a correctional facility
    - DPSCS has issued isolation and quarantine procedures.
    - Corizon Health has test kits, the ability to quarantine prisoners. suspected to have COVID-19, and procedures to transport prisoners to a local hospital if necessary.
    - CDF has an area of prisoner cells separate from other housing units that it has prepared to use for ill and quarantined detainees.

- o If necessary, prisoners can be transported to the Metropolitan Transition Center Hospital Unit for care, which has an infirmary.
- o Incoming inmates are quarantined in a separate pod for 14 days before being put into the general population.
- o Prisoners over 50 are placed in an isolation pod for close observation and temperature checks three times a day.
- o Social distancing in the housing units is limited.
- o CDF Case Management provides prisoners with attorney calls and has a visiting booth for attorneys that allow for social distancing.
- o CDF has acquired the services of ProtionPac to provide sanitation training and guidance to staff and prisoner sanitation workers.
- o Prisoners are provided with cleaning supplies to clean their cells and common areas a minimum of three times a day.  The cleaning supplies are: Correc Pac Heavy Duty Cleaner, Correc Pac Bathroom Cleaner, Correc Pac Germicidal, Correc Pac Glass Cleaner, GOJO Natural, Orange Pumice Hand Clear, Lice All Shampoo, Liquid Antibacterial Soap, Para Urinal Blocks, Skil-Craft Laundry detergent, A-1 Bleach, Sani Cloth Plus Germicidal Disposable Clothes, brooms, mops, scrub brushes, and scrubbing pads to clean their housing units.
- o All prisoners are issued washable masks, which may be replaced upon request. Laundry facilities are available for all prisoners at least twice a week, if not daily, depending on housing assignments.
- o A COVID-19 Environmental Compliance Safety Officer audit was conducted April 21, 2020, which concluded that staff were in compliance with State social distancing and PPE practices.  That same audit is referenced above, and the audit report is attached as Exhibit 18.

- Per USM Hughes's letter, Gary McLhinney, Maryland DPSCS's Assistant Secretary of Special Operations, has advised:
  - o On March 12, 2020, visitation was suspended at DPSCS facilities.
  - o On March 13, 2020, sanitation routines were increased and inmates were provided five free phone calls per week.
  - o On March 20, 2020, all new detainees spend 14 days in quarantine before going to the general population, staff were required to answer COVID-19 screening questions upon entering CDF, and detainees recreation was reduced to groups less than ten.
  - o On March 21, 2020, contact with staff was limited to safety and security (no roll calls or physical searches).
  - o On March 24, 2020, staff began receiving a temperature check when they arrived for work.
  - o On April 7, 2020, all CDF correctional staff were issued sneeze-guards for mandatory use.  This was increased to dace shields and gloved on April 9, 2020.
  - o On April 11, 2020, detainees were issued sneeze-guards for mandatory use.

    o  As of April 24, 2020, no detainees have tested positive for COVID-19. One employee tested positive on April 22, 2020.

In the Memorandum dated May 15, 2020, Magistrate Judge Boardman acknowledged that the Government submitted voluminous materials concerning the policies and protocols issued and implemented as a result of the COVID-19 pandemic, but questioned the methods and procedures at CDF regarding contact tracing. *See* Memorandum, ECF No. 22, at 2-3. In addition, Magistrate Boardman stated that "…no one has provided me with any evidence, policies, or procedures regarding the testing of jail staff or detainees." *Id.* at 3. As to contact tracing, CDF has implemented effective policies to handle contact tracing of inmates and employees. *See* DPSCS Worksite Exposure Tracing Memorandum, attached hereto as Exhibit 21. In addition, CDF follows the policies and protocols for testing set forth in the Corizon COVID-19 Interim Guidance, attached as Exhibit 22.

In sum, the information, policy documents, and audit/inspection reports set forth above indicate that DPSCS and CDF have prepared reasonable measures to address the COVID-19 situation, and are making reasonable efforts to enforce those policies.

    **B.**    **Gallagher's Individual Circumstances Do Not Merit Release.**

Gallagher does not claim to have any medical condition that would cause him to be vulnerable to the COVID-19 virus and, therefore, he should not be released. During his first detention hearing, Gallagher did not claim that any medical condition that made him more susceptible to infection of the COVID-19 virus. Likewise, in his second motion for review of detention order, Gallagher does not mention any medical condition that compromises his health and increases the likelihood of infection. ECF No. 15. During the hearing before Magistrate Judge Boardman on May 15, 2020, Gallagher's attorney suggested for the first time that Gallagher has

high blood pressure and high cholesterol.  No medical records were provided by Gallagher to support his claims.

Even if Gallagher had a medical condition that caused vulnerability to the COVID-19 virus, his medical needs would be met fully.  By virtue of being in a detention facility, the defendant is in the presence of medical professionals at all times.  Each DPSCS facility has privatized medical doctors and nurses who monitor and provide care onsite to detainees who have chronic diseases, such as asthma, diabetes, and hypertension.  There are multiple points of access for detainees with asthma and other chronic diseases to seek medical care, whether for routine or emergency needs, including on-site dispensaries, infirmaries, and clinics that provide acute and chronic treatment for these types of illnesses.  DPSCS also contracts with on-site pharmacists, who are available to help providers make the best recommendations for Asthma therapy and other chronic diseases.  In addition, clinical pharmacists are on call at all times, day or night.  If the defendant should need intensive treatment that cannot be provided inside CDF, there is a hospital located directly across the street from CDF to provide non-emergency care and detainees are transported to community hospitals in the event of an emergency.

Between the medical professionals at CDF and the medical professionals at the hospitals, the defendant has access to all of the care that he needs.  If the defendant requires any sort of medical care, he will receive it.  In the unlikely event that the defendant becomes infected with COVID-19, he will be quarantined, monitored, and receive any needed treatment, consistent with the CDC guidelines.  And if the defendant needs specialized care for an unforeseen illness or injury, the medical staff at CDF will refer him to an outside professional.  In short, there are sufficient resources, both inside and outside CDF, to ensure that the defendant's medical needs are addressed.

While the COVID-19 virus is new, health claims by detainees are not.  Courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where otherwise detention would be warranted.  *United States v. Wages*, 271 Fed. App'x 726, 728 (10th Cir. 2008).  These cases recognize that reasonably necessary treatments are available in prison, and often times a prison setting will provide superior care than a defendant can obtain on the outside.  *See United States v. Rodriguez*, 50 F. Supp. 2d 717, 722 (N.D. Ohio 1999).  In this case, the defendant simply has not made a factual record that his needs will not be met while detained.  Granting a defendant's motion for release based on a general, speculative claim of harm flies in the face of the defendant-specific analysis required by 18 U.S.C. § 3142(f).

Furthermore, the defendant's proposed placement outside of the facility does not eliminate the danger of contracting COVID-19.  *See United States v. Gray*, GJH-19-407, ECF No. 120 (recognizing "the unfortunate reality that public health officials are struggling to contain the spread of the virus in the general public as well").  Here, Gallagher's release plan does not provide any details as to how he would effectively avoid or mitigate the risk of COVID-19 should he be released to any of his proffered third-party custodians.  Without the ability to identify screening practices or concrete COVID-19 precautions at the residence, the limited and strictly enforced access to jails better "serves to minimize Defendant's COVID-19 exposure."  *United States v. Smoot*, Crim. No. 2:19-CR-20, 2020 WL 1501810, at *3 (S.D. Ohio Mar. 30, 2020)."

Moreover, Gallagher's proposed custodians present are within a group of persons believed by medical professionals to be at a higher risk of developing severe disease if exposed to COVID-19.  *See*  https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.  Gallagher's proposed custodians are his mother, Gina Pino, age 54 and disabled, and

his grandmother, Diane Engstrom, age 75.   Gallagher's step-grandfather, Phillip Engstrom, age 76, also resides in the proposed custodial residence.   Mr. Engstrom suffered a stroke and requires Mrs. Engstrom's care.   Neither Gallagher nor Magistrate Judge Boardman took into consideration the risk that Gallagher would pose to his family if he transferred out of CDF to their home.   Two of the three residents are in the category of persons who at higher risk of developing severe disease if exposed to COVID-19.   One of those residents, Mr. Engstrom, likely has undisclosed medical complications as a result of his stroke that would make him severely vulnerable to the COVID-19 virus.    Again, none of these factors were considered by Magistrate Judge Boardman in her Memorandum in support of her order setting conditions of release.   *See* ECF No. 22.

Moreover, Gallagher's multiple violations while under court supervision demonstrate he is not a good candidate for community supervision.   Just as he could not be trusted to comply with the conditions of his supervision in prior cases, he cannot be trusted to adhere to the social distancing guidelines that are so necessary to protect not only his own health, but the health of the community.   *United States v. Chase*, JKB-19-0473 (D. Md. May 11, 2020), ECF No. 34 (Order by Chief Judge Bredar) ("However, the success of Chase's proposed release plan would be contingent upon Chase strictly following any quarantine instructions and relevant state policies following his release. Chase has violated the terms of his probation in the past [and] is a repeat offender. The Court is skeptical that Chase would abide by such rules given his history of noncompliance."); *see also United States v. McKenzie*, 18 Cr. 834 (PAE), ECF No. 457 (S.D.N.Y. April 6, 2020) (defendant who had been granted pre-sentence release based on the risk of becoming ill from COVID-19 immediately violated his release conditions and risked the health of his community by hosting a welcome-home party with numerous others).

C.     **Many Traditional Release Conditions Are No Longer An Option for Pretrial Services.**

Pretrial Services now has diminished ability to monitor defendants on home detention.  Due to COVID-19, the Court has suspended traditional electronic home monitoring that relies on radio frequency or GPS to provide real-time information about a defendant's whereabouts.  Instead, pretrial services is relying on a smartphone application that provides GPS information about the location of a detainee's cellular device.  Although other forms of home detention are still available, "none provides 24/7 monitoring and notification."  *Gibson-Bey*, RDB-19-563 (D. Md.), ECF 2, at 3 n.2.  Accordingly, Pretrial Services' ability to ensure that defendants do not become a flight risk or pose a danger to the community has been significantly curtailed.  In addition, Pretrial Services is no longer conducting standard home visits, to avoid exposing their officers to the risk of transmission.

Furthermore, electronic monitoring simply is not a replacement for incarceration, as home monitoring does not prevent others from coming to the defendant's residence, which increases the risk of the defendant violating the law, as well as his exposure to COVID-19.  *See, e.g.*, *United States v. McKenzie*, 18 Cr. 834 (PAE), ECF No. 457 (S.D.N.Y. April 6, 2020) (defendant who had been granted pre-sentence release based on the risk of becoming ill from COVID-19 immediately violated his release conditions and risked the health of his community by hosting a welcome-home party with numerous others).

Gallagher has proposed that he reside with his mother and grandmother in Selbyville, Delaware, because the State of Delaware is able to provide location monitoring services.  This process would require Gallagher to be quarantined for 14 days without full electronic monitoring capabilities.  The process would allow Gallagher a window of time and opportunity to flee or otherwise violate the conditions of his release.  Moreover, electronic home monitoring cannot

ensure the safety of the community or reduce Gallagher's risk of flight in light of his prior history of removal of electronic monitoring equipment and flight.  While learning of the federal charges pending against him, Gallagher removed the GPS ankle monitor and fled to California.  While his custodians "assured" Magistrate Judge Boardman that he would not repeat his conduct, this Court should not be so persuaded.  Gallagher has a terrible record of performance while under court supervision.  In fact, he has never successfully complied with court supervision in his adult life.  Given his history, the risk is simply too great to allow Gallagher back into the community with nothing more than verbal assurances of compliance from his proposed custodians.

Importantly, even with Gallagher's proposed custodians and request to be monitored in Delaware, U.S. Pretrial Services recommended that Gallagher be detained pending trial.

In sum, the continued detention of defendants like Devin Gallagher is necessary to ensure public safety and does not endanger public health.  Based on his history, he is safer at CDF than at any other place in the community.

## CONCLUSION

For the foregoing reasons, the Court should deny defendant Devin Gallagher's second motion for release and order his continued detention pending trial.

Respectfully submitted,

Robert K. Hur
United States Attorney

John W. Sippel, Jr.
Assistant United States Attorney

24

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 19th day of May 2020, a copy of the foregoing Government's Memorandum in Support of Defendant Devin Gallagher's Pretrial Detention was served upon counsel for the Defendant via the ECF filing system.

John W. Sippel, Jr.
Assistant United States Attorney

25