IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

CRIMINAL NO.: ELH-19-0479

DEVIN GALLAGHER,
*Defendant.*

**MEMORANDUM OPINION**

Defendant Devin Gallagher entered a plea of guilty in November 2020 to the offense of possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1). ECF 44.  On May 7, 2021, the Court sentenced Gallagher to a term of 85 months of imprisonment. ECF 60 (Judgment).  Gallagher, who is now self-represented,[1] has filed a motion for compassionate release or reduction in sentence, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) and the First Step Act 2018.  ECF 65.  Gallagher has also filed supplements (ECF 71; ECF 90; ECF 91), with exhibits.  I shall refer to defendant's submissions collectively as the "Motion."

The government opposes the Motion (ECF 73, the "Opposition").  The Opposition is supported by several exhibits.  ECF 73-1 to ECF 73-4.  Defendant has replied.  ECF 84 (the "Reply").

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion, without prejudice.

---

[1] The Office of the Federal Public Defender advised the Court that it would not supplement Gallagher's pro se filing.  ECF 67.

## I.    Procedural and Factual Background

Gallagher was indicted on October 9, 2019.  ECF 1.  In particular, he was charged with possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1) (Count One); possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 942(c) (Count Two); and possession of a firearm and ammunition by a prohibited person, in violation of 18 U.S.C. § 922(g)(1) (Count Three).  Gallagher was arrested on October 31, 2019 (ECF 6) and has been incarcerated ever since.

Pursuant to a Plea Agreement (ECF 46), defendant entered a plea of guilty on November 17, 2020, to Count One of the Indictment.  ECF 44.  Each side reserved the right to advocate for a reasonable sentence.  ECF 46, ¶ 8.

The Plea Agreement contained a lengthy factual stipulation.  It stated, ECF 46 at 10-11:

> In April 2019, a confidential informant informed the Anne Arundel County Police Department that defendant Gallagher was selling large quantities of marijuana in the Cape St. Clair area of Annapolis, Maryland. On April 25, 2019, detectives conducted surveillance of Gallagher and saw him exit a black Chevrolet Impala at 570 Bellerive Road, which is an apartment complex in Annapolis. Detectives observed Gallagher enter the black Chevrolet Impala with a backpack. Gallagher then drove to a back parking lot of the apartment complex. On April 30, 2019, a K-9 scan of Gallagher's black Chevrolet resulted in a positive alert for controlled dangerous substances.

> In May 2019, investigators continued surveillance of Gallagher's movements and installed a court-authorized GPS tracking unit on Gallagher's black Impala. Law enforcement agents also established surveillance of a white van with West Virginia dealer tags parked at 582 Bellerive Road. Detectives knew that the West Virginia dealer tag was associated with Gallagher because he had been stopped previously in two different vehicles displaying the tag.

> On May 3, 2019, based on GPS tracking and surveillance, detectives observed Gallagher enter the parking lot at 582 Bellerive Road and park behind the white van. Gallagher exited his black Chevrolet Impala, approached the van, and unlocked the van's rear doors. Gallagher then removed two large boxes and placed them in his black Impala. Gallagher also retrieved a backpack from the van.

On May 7, 2019, a K-9 scan of the white van with the West Virginia dealer tag [was conducted], and the K-9 dog alerted for the positive presence of a controlled dangerous substance inside of the van. Later that day, Gallagher was followed to SunTrust Bank where he made a cash deposit. Gallagher then drove to an Xfinity store located at 2077 Somerville Road in Annapolis. Gallagher had previously attempted to mail a package (an Xfinity box containing a black cable, Xfinity paperwork, and $7,500 in U.S. currency in a heat-sealed plastic bag wrapped in aluminum foil and saw dust) from the Xfinity store. Gallagher then went to a Wells Fargo bank and deposited U.S. currency. The GPS tracking device showed that Gallagher went back to 570 Bellerive Road. Surveillance was set-up at the white van parked at 582 Bellerive Road. During mid-afternoon, Gallagher arrived at 582 Bellerive and parked behind the van. Gallagher unlocked the rear door of the van, removed a brown bag, and handed it to a passenger in Gallagher's black Chevrolet Impala. Gallagher locked the van and the two men drove away. Gallagher was then observed at 570 Bellerive unloading a large box from his vehicle. Gallagher took the box to his apartment (#143).

On May 9, 2019, detectives conducted a K-9 scan of the front door area of Apartment 143 at 570 Bellerive Road, resulting in a positive alert for a controlled dangerous substance. The K-9 then had a positive alert for a controlled dangerous substance at Gallagher's vehicle, which was parked near the rear parking lot of 570 Bellerive Road.

On May 9, 2019, detectives executed search warrants at Gallagher's residence located at 570 Bellerive Road, Apt. 143, and his two vehicles: the Chevrolet Impala and the white van. Search of the white van yielded approximately two kilograms of marijuana; approximately 6,000 grams (net) of THC cartridges; an unloaded .40 caliber Smith & Wesson handgun; a .40 caliber magazine containing eight rounds; and documents in Gallagher's name, among other things. Search of the Chevrolet Impala yielded $4,300 in U.S. currency; 172 grams (net) of THC cartridges; and documents in Gallagher's name. The search of Gallagher's residence resulted in the seizure of approximately $38,960.00 in U.S. currency; a small amount of marijuana; drug packaging paraphernalia; and paperwork in Gallagher's name. Gallagher also had approximately $1,910.00 in U.S. currency in his pants pocket at the time of his arrest.

Gallagher stipulates and agrees that he possessed the marijuana and THC with the intent to distribute the Schedule I controlled substances

Count One carries a maximum penalty of ten years of imprisonment.  ECF 46, ¶ 3.  In the

Plea Agreement, the parties agreed that defendant qualified as a career offender under § 4B1.1 of

the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines").  *Id.* ¶ 6(c).  The parties also

agreed to a base offense level of 24 and contemplated a three-level deduction for acceptance of responsibility under U.S.S.G. 3E1.1.  As a result, Gallagher had a final offense level of 21.

Consistent with the Plea Agreement, the Presentence Investigation Report (ECF 51, "PSR") indicates that the defendant qualified as a career offender because of at least two prior and distinct convictions for felony drug offenses.  ECF 51, ¶ 25.  It also reflects a final offense level of 21.  *Id.* ¶ 28.

Sentencing was held on May 7, 2021.  ECF 59.  At the time of sentencing, defendant was 28 years old.  ECF 51 at 2.  Defendant is 5'8" tall and weighed 200 pounds.  *Id.* ¶ 72.  The PSA also reflected that defendant has a long history of drug abuse, dating to age nine.  *Id.* ¶¶ 82-84.  He participated in several drug treatment programs.  *Id.* ¶¶ 85-87.

According to the PSR, Gallagher had eleven prior adult criminal convictions in Maryland, all of which scored points.  *Id.* ¶¶ 36-46.  In particular, in 2010, at the age of 18, defendant was convicted of theft and was sentenced to three years of incarceration, with all but five days suspended.  *Id.* ¶ 36.  That same year, defendant was found guilty of unlawful possession with intent to distribute a controlled dangerous substance and was sentenced to four years of incarceration, with two years and six months suspended.  *Id.* ¶ 37.  In 2012, at the age of 20, defendant was again convicted of theft (*id.* ¶ 40) and of unlawful possession of a controlled dangerous substance.  *Id.* ¶ 41.  And, on two occasions in 2013, defendant was convicted of a total of three felony drug offenses.  *Id.* ¶¶ 44, 45.  For the later two drug offenses, defendant was sentenced to twenty years of incarceration, of which ten years were suspended.  *Id.* ¶ 45.

Gallagher's criminal convictions yielded a subtotal criminal history score of 23.  *Id.* ¶ 47.  Two points were added because, at the time of the instant offense, Gallagher was on parole.  *Id.* ¶ 48.  Thus, as calculated by the PSR, Gallagher had a total criminal history score of 25 points,

yielding a criminal history category of VI.  ECF 51, ¶ 49.  With a final offense level of 21 and a criminal history category of VI, the Guidelines called for a period of incarceration ranging from 77 to 96 months.  *Id.* ¶ 98.

The Court sentenced defendant to a Guidelines sentence of 85 months of incarceration. ECF 60.  The Court also imposed a term of four years of supervised release.  *Id.*  No appeal was taken by the defendant.

Defendant is currently incarcerated at Canaan USP in Waymart, Pennsylvania.  *Inmate Locator*, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited December 13, 2022). With credit for pretrial detention dating from October 31, 2019, defendant has served about 38 months of his 85-month sentence, or approximately 45% of his sentence.  The Bureau of Prisons ("BOP") indicates that defendant has a projected release date of December 31, 2025.

On August 16, 2021, just a few months after sentencing, Gallagher filed a Request for Reduction of Sentence with the Warden based on his "chance of getting corona."  ECF 73-1.  That request was denied on September 29, 2021.  ECF 73-2.  This Motion followed on November 29, 2021.  ECF 65.

In the initial Motion (ECF 65), Gallagher did not cite to any specific reason as to why he is requesting compassionate release.  However, in his supplement to the Motion (ECF 71), filed on February 10, 2022, defendant requested compassionate release based on rehabilitation, a change in the law, disparity in sentencing, and his age at the time of the offense.  *Id.*  And, in his supplement dated August 1, 2022 (ECF 90), Gallagher argued that the Court should consider his "increased risk of serious illness or death due to Covid-19 as an extraordinary and compelling reason for relief."  *Id.* at 6.

The government does not contest that defendant has exhausted his administrative remedies.

ECF 73 at 18.  But, it argues that the "[f]ear of contracting the novel coronavirus while incarcerated is not sufficient reason for granting compassionate release."  *Id.*  In particular, the government states that "Gallagher has not identified any medical condition, and his medical records do not contain any diagnosis of any medical condition, that establishes 'extraordinary and compelling' circumstances . . . ."  *Id*. at 19.  Additionally, it notes that defendant has received the Pfizer vaccine. *Id*. at 21.[2]  In any event, the government argues that the sentencing factors in 18 U.S.C. § 3553(a) support a denial of relief.  *Id*. at 31-32.

Additional facts are included, *infra*.

## II.       Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Bethea*, ___ F.4th ___, 2022 WL 17588045, at *3 (4th Cir. Dec. 13, 2022), amended Dec. 14, 2022; *United States v. Ferguson,* ___F.4th___, 2022 WL 17256572, at *3 (4th Cir. Nov. 29, 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i); *see Hargrove*, 30 F.4th at 194.

---

[2] According to defendant's medical records, Gallagher received his second dose of the Pfizer vaccine on June 22, 2021.  ECF 7-4.

This provision is an exception to the ordinary rule of finality.  *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was first enacted as part of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See Bethea*, 2022 WL 17588045, at * 3; *see e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. No. 115-391, 132 Stat. 5194 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020).  As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a federal inmate to file a motion for compassionate release directly with the court after exhaustion of administrative remedies.

Specifically, pursuant to the 2018 FSA, the Court may reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the

warden of the defendant's facility," whichever occurs first.  (Emphasis added).  *Id.*  So, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, the defendant may petition a court directly for compassionate release.  *Ferguson*, 2022 WL 17256572, *3; *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.  This constituted a sea change in the law.

But, under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only if two criteria are met.  *Bethea*, 2022 WL 17588045, at *3.  And, the court must conclude that the movant satisfies both criteria.  *Id.*; *see Hargrove*, 30 F.4th at 194-95.

"First, the court must determine the prisoner is eligible for a sentence reduction because he has shown 'extraordinary and compelling reasons' supporting relief."  *Bethea*, 2022 WL 17988045, at *3 (citation omitted).  If that criteria is met, the court "must then find that release is appropriate under the 18 U.S.C. § 3553(a) sentencing factors, to the extent those factors are applicable."  *Id.*; *see also Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021); *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021).

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis."  *Jenkins*, 22 F.4th at 169.  But, the Fourth Circuit has said: "When deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'"  *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C.

§ 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release.  *See McCoy,* 981 F.3d at 276-77.[3]  In particular, U.S.S.G. § 1B1.13 provides that on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "Other Reasons," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category."  *McCoy*, 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act.  *McCoy*, 981 F.3d at 276.  Of significance here, it is *only* "directed at BOP requests for sentence reductions." *Id.* (citing U.S.S.G. § 1B1.13).  Thus, "[b]y its plain terms. . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States*

---

[3] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C).  *See McCoy,* 981 F.3d at 276.

*v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. And, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to the defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to [U.S.S.G.] § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see also United States v. Brice*, ___ F. App'x ___, 2022 WL 3715086, at *1 (4th Cir. Aug. 29, 2022) (per curiam); *Hargrove*, 30 F.4th at 194-95. Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197. Notably, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons. *United States v. Harris*, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam). Nevertheless, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *Harris*, 2022 WL 636627, at *1; 28 U.S.C. § 994(t). Moreover, "[i]n deciding a motion for compassionate release, the district court is confined to the evidence presented." *Bethea*, 2022 WL 17588045, at *5, n.2; *see also United States v. Osman*, 2022 WL 485183, at *1 (4th Cir. Feb. 17, 2022).

The Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169.  However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.

Of relevance here, the Supreme Court decided *Concepcion v. United States*, ___ U.S. ___, 142 S. Ct. 2389 (2022), on June 27, 2022.  In that case, the Supreme Court ruled, in the context of § 404(b) of the First Step Act, that, when raised by the parties, the district court is obligated to consider intervening changes in the law and factual developments.  *Id.* at 2396; *see Brice*, 2022 WL 3715086, at *2.

In sum, there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release. Nevertheless, U.S.S.G. § 1B1.13 "remains helpful guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194.  And, as mentioned, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for release'" raised by a defendant.  *McCoy*, 981 F.3d at 284 (citation omitted); *see Concepcion*, 142 S. Ct. at 2396; *Jenkins*, 22 F.4th at 169.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020).  And, compassionate release is a "rare" remedy.  *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

As noted, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court must consider the factors under 18 U.S.C.

11

§ 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *Bethea*, 2022 WL 17588045, at *3; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors).

To be sure, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018); *High*, 997 F.3d at 187. But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167. Additionally, "the district court is less likely to have abused its discretion

if it considered arguments in opposition to its ultimate decision." *Bethea*, 2022 WL 17588045, at *6; *see also High*, 997 F.3d at 189; *Kibble*, 992 F.3d at 332.

Notably, "it weighs against an abuse of discretion—and is viewed as 'significant'—when the same judge who sentenced the defendant rules on the compassionate release motion." *Bethea*, 2022 WL 17588045, at *6; *see Hargrove*, 30 F.4th at 200.  That factor is applicable here.

In any event, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case."  *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190). And, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'"  *Id.* (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).  In doing so, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors when explaining its compassionate release ruling." *Bethea*, 2022 WL 17588045 at *6; *see Kibble*, 992 F.3d at 332.

### III.    COVID-19[4]

#### A.

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[5]  COVID-19 spawned "a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA*

---

[4] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[5] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

*v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).

People who are stricken with the coronavirus sometimes experience only mild or moderate symptoms.  But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S. COVID deaths after losing political battles*, Reuters (May 12, 2022), https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/. And, as of December 13, 2022, COVID-19 has infected more than 99 million Americans.  *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed December 13, 2022).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic.  *Id.*  That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").

For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious.  *See Coronavirus Disease 2019 (COVID-19),*

*How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. The judiciary, too, faced many operational challenges. Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus. The risk factors initially identified by the CDC included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16. But, the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. In November 2022, it updated its guidance to reflect the most available data. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (November 22, 2022), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and possibly hypertension; HIV; being immunocompromised; liver disease; obesity, where the BMI is 25 or higher; physical inactivity; pregnancy; sickle cell disease;

smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis. *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1. Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*, https://bit.ly/38S4NfY.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 30 F.4th at 195. In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at 196. Nevertheless, the court may consider the CDC's guidelines. *Bethea*, 2022 WL 17588045, at *4; *United States v. Petway*, 2022 WL 168577, at *3 (4th Cir. Jan. 19, 2022) (per curiam). And, "the inquiry should consider whether the underlying condition places the inmate at an increased risk of severe illness from Covid-19." *Bethea*, 2022 WL 17588045, at *4.

**B.**

At the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). However, social distancing is particularly difficult in the penal setting. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir.

16

Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area.").   Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus.   *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").   Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.   Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. Times (Mar. 16, 2020).   And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe,'* Wash. Post (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.   *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. Times (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from

approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health,

School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons,

the inability to employ effective social distancing measures, and the many high-contact surfaces

within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S.

493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California

prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help

prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented

substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to

treat those who are infected. As the Third Circuit recognized in *United States v. Raia*, 954 F.3d

594, 597 (3rd Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's

spread."[6]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19

experienced by inmates and employees of the BOP. The DOJ adopted the position that an inmate

---

[6] In June 2020, the *New York Times* reported that cases of COVID-19 had "soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; On October 29, 2020, the *New York Times* reported that "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

### C.

Notably, there is no cure for the coronavirus.  But, medical treatments have continued to improve.  And, significantly, we have seen the rollout of four vaccines for COVID-19 (Pfizer,

Moderna, Johnson & Johnson, and Novavax).  *See* Rebecca Robbins and Carl Zimmer, *A fourth COVID vaccine is cleared for use in the United States.*, N.Y. TIMES (July 20, 2022), https://www.nytimes.com/2022/07/19/health/cdc-novavax-covid-vaccine.html.  Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since been approved for all persons six months of age and older.  *See* Rhitu Chatterjee, *CDC clears the way for vaccinations for children 6 months to 5 years old*, NPR (June 18, 2022), https://www.npr.org/sections/health-shots/2022/06/18/1105929247/vaccinations-for-children-6-months-to-5-years-old-can-begin-after-cdc-clears-the.

As of October 2022, approximately 68% of the total U.S. population is fully vaccinated, including 32% of people from ages 5 to 11, 61% of people from ages 12 to 17, 74% of people from ages 18 to 64, and 93% of people age 65 and up.  *See How Vaccinations Are Going in Your County and State*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last updated October 20, 2022).  Moreover, approximately 107.5 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 18 and older.  *See id.*; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated November 1, 2022).

Federal regulators approved a second and third booster dose for individuals age 50 and older as well as those at higher risk.  *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.  Additionally, on September 1, 2022, the CDC recommended updated

COVID-19 boosters from Pfizer-BioNTech for people ages 12 years and older and from Moderna for people ages 18 years and older. *CDC Recommends the First Updated COVID-19 Booster*, CTRS. FOR DISEASE CONTROL (Sept. 1, 2022), https://www.cdc.gov/media/releases/2022/s0901-covid-19-booster.html

On January 4, 2021, at about the time of the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance." *See COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf.  It provided that administration of the COVID-19 vaccine (Pfizer and Moderna) would "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine.  *Id.* at 6.  The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f.  Much has changed since that time.

As of December 20, 2022, the BOP had 145,463 federal inmates and approximately 36,000 staff.  And, by that date, the BOP had administered 342,987 vaccine doses to staff and inmates. *See* BUREAU OF PRISONS,  https://www.bop.gov/coronavirus/ (last accessed December 20, 2022).

### D.

The number of COVID-19 cases continues to fluctuate.  For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases.  *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on

Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region.").  But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was thought to be more virulent than earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants");  *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, sparking concern because it was highly contagious. *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021).  Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases. *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.

But, the number of COVID-19 cases again declined.  *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records*., WASH. POST (Feb. 7, 2022),          https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y.    And, the country began to return to normalcy.

Unfortunately, we soon experienced another surge in COVID-19 cases.  *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html.  In particular, in the spring of 2022 a new variant of the virus began "spreading rapidly" and soon became "the dominant form of the virus . . . ."  *See* Isabella Grullón Paz, *A new subvariant is spreading rapidly in the United States*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases.   As of July 2022, the BA.5 variant of COVID-19, an "offshoot of the Omicron variant," was "spreading quickly," buttressed by an increased ability to overcome "some of the immune defenses acquired by vaccinated people, or those infected by earlier variants."  Ed Yong, *Is BA.5 the 'Reinfection Wave'?*, THE ATLANTIC (July 11, 2022), https://www.theatlantic.com/health/archive/2022/07/ba5-omicron-variant-covid-surge-immunity-reinfection/670485/.   But, the variant then seemed to subside.  *See COVID Data Tracker: Variant Proportions*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://covid.cdc.gov/covid-data-tracker/#variant-proportions (last updated Nov. 12, 2022).

At this point, COVID-19 has, in a sense, become a fact of life.  *See* Mitch Smith and Julie Bosman, *Covid Deaths Surge Across a Weary America as a Once-Hopeful Summer Ends*, N.Y. TIMES, Sept. 5, 2021,  https://www.nytimes.com/2021/09/05/us/covid-surge-united-states.html

("[T]he coronavirus is going to remain a fact of American life for the foreseeable future.").   In other words, we are in "a more endemic phase of this crisis . . . ."  *See* District of Maryland Standing Order 2022-05, Misc. No. 00-308 (filed Dec. 14, 2022).

Indeed, in an interview in September 2022 on the CBS television show "60 Minutes", President Biden claimed that the pandemic is "over" in the United States.  Alexander Tin, *Biden says Covid-19 pandemic is "over" in U.S.*, CBS NEWS (Sept. 19, 2022).  He stated: "The pandemic is over. We still have a problem with COVID. We're still doing a lotta work on it. . . . But the pandemic is over." *Id.*  On the other hand, news reports suggest that we may experience yet another surge of cases in the coming months.  *See*, *e.g.*, *Quick and stealthy 'Scrabble variants' are poised to drive a winter Covid-19 surge*, CBS NEWS (Oct. 20, 2022), https://www.cbsnews.com/baltimore/news/quick-and-stealthy-scrabble-variants-are-poised-to-drive-a-winter-covid-19-surge/.

Notably, "virus metrics have stabilized."  Standing Order 2022-05.  And, as Chief Judge Bredar of this Court recently noted, in consultation with the court's epidemiologist, the virus patterns have changed, with the virus's severity decreasing as "the population has gained some level of immunity from vaccinations and prior infections."  *Id.*

With respect to the BOP, it has reported that, as of December 8, 2022, 203 federal inmates, out of a total population of 144,881, and 159 BOP staff, out of some 36,000 staff members, currently test positive for COVID-19.  Moreover, 47,564 inmates and 14,672 staff have recovered from the COVID-19 virus.  In addition, 309 inmates and seven staff members have died from the virus.  The BOP has completed 128,660 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to Canaan USP, where the defendant is imprisoned, the BOP reported that as of December 14, 2022, out of a total of 1,330 inmates, zero inmates and five staff members have currently test positive, zero inmates and zero staff members have died of COVID-19, and 376 inmates and 212 staff have recovered at the facility.  In addition, 209 staff members and 1,304 inmates have been inoculated with the vaccine at FCI McKean.  *See* https://www.bop.gov/coronavirus/;                     BUREAU          OF          PRISONS, https://www.bop.gov/locations/institutions/btf/ (last visited December 14, 2022).

## IV.    Discussion

I first consider whether defendant has presented the Court with an extraordinary and compelling reason for his release.  As mentioned, Gallagher argues that he is at an increased risk of serious illness or death due to the coronavirus.  ECF 90 at 6.  However, defendant, who is now 30 years of age, has failed to identify any underlying medical condition that would elevate the risk posed to him by COVID-19.

 Notably, the government has provided the Court with copies of defendant's medical records.  ECF 73-3.  And, his medical records do not reveal any conditions listed on the CDC's list of risk factors that would entitle him to relief.  Furthermore, the defendant has received the Pfizer vaccine.  ECF 73-4.

The Court does not accept the government's argument that a defendant's vaccination "precludes eligibility for compassionate release."  ECF 73 at 21.  It is without question that the COVID-19 vaccines have been useful in reducing the health risks posed by the coronavirus.  But, they are not entirely effective.  "The variants have shown a remarkable ability to get around the protection offered by infection and vaccination."  Carla K. Johnson, *Experts decry little action as COVID-19 cases surge*, Balt. Sun (July 14, 2022).

Moreover, the CDC issued recommendations encouraging everyone ages 12 years and older to receive a COVID-19 booster shot after completing primary COVID-19 vaccination. *See COVID-19 Vaccine Boosters*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3MdQMM6 (last updated August 23, 2022)). And, all adults ages 50 years and older are eligible for a second booster shot. *Id.* Yet, the parties have not presented the Court with any evidence regarding whether defendant has received a booster.

In addition, as illustrated above, the future trajectory of the COVID-19 pandemic is anything but predictable. As Judge Grimm said in *United States v. Palmer*, PWG-13-623, 2021 WL 3212586, at *3 (D. Md. July 29, 2021): "It is impossible to predict the impact of the vaccines on future strains of the virus, just as it is impossible to predict the impact of COVID-19 on [defendant's] specific medical issues."

The CDC has confirmed that breakthrough infections of COVID-19 occur even among vaccinated individuals and, albeit in rare cases, they can result in death. *See Rates of COVID-19 Cases and Death by Vaccination Status*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status (last accessed Dec. 20, 2022). An analysis of "nationwide data from the Center for Disease Control and Prevention" revealed that "[t]he vaccinated made up 42 percent of fatalities in January and February [of 2022,] during the highly contagious omicron variant's surge, compared with 23 percent of the dead in September, the peak of the delta wave." Fenit Nirappil & Dan Keating, *Covid deaths no longer overwhelmingly among the unvaccinated as toll on elderly grows*, Wash. Post (Apr. 29, 2022), https://www.washingtonpost.com/health/2022/04/29/covid-deaths-unvaccinated-boosters/.

Further, several judges of this Court have concluded that an inmate is eligible for compassionate release, notwithstanding vaccination status. *See e.g.*, *United States v. Hegie*, RDB-14-411, 2022 WL 605383, at *2 (D. Md. Mar. 1, 2022) (finding that, in light of the COVID-19 pandemic, a fully vaccinated defendant who suffered from obesity and asthma presented an extraordinary and compelling reason for his release); *United States v. Coleman*, PWG-17-393, WL 356724, at *3 (D. Md. Feb. 7, 2022) (determining that, in light of the dynamic nature of the COVID-19 pandemic and the absence of any information concerning the inmate's vaccination status, defendant's underlying medical conditions qualified as an extraordinary and compelling reason for his release); *United States v. Rivas*, TDC-19-0417, 2022 WL 36941, at *2 (D. Md. Jan. 4, 2022) (explaining that vaccinated defendant who was a paraplegic and suffered from frequent urinary tract infections could satisfy the extraordinary and compelling prong of the analysis). "At the end of the day, district judges are not epidemiologists." *United States v. Sherrod*, 19-20139, 2021 WL 3473236, at *5 (E.D. Mich. Aug. 6, 2021).

Nonetheless, to the extent Gallagher relies on COVID-19 as a basis for his release, he must establish a qualifying medical condition to demonstrate that he is particularly susceptible to COVID-19 and thus eligible for compassionate release. And, as discussed, defendant appears to be in relatively good health. Moreover, the fear of COVID-19 does not constitute an extraordinary and compelling circumstance that warrants an inmate's release. Judge Chasanow of this Court explained: "While all share the concern of the public health challenges caused by COVID-19, and appreciate the heightened anxiety experienced by those incarcerated in correctional facilities . . ., generalized and unspecific reasons . . . do not satisfy the standard for compassionate release." *United States v. Harris*, DKC-08-319, 2020 WL 2512420, at *1 (D. Md. May 15, 2020).

Accordingly, Gallagher has failed to establish extraordinary and compelling circumstances for his release based on vulnerability to the coronavirus.

A defendant's extremely lengthy sentence may also qualify as an extraordinary and compelling reason for compassionate release. *See McCoy*, 981 F.3d at 286 ("[T]he district courts permissibly treated as 'extraordinary and compelling reasons' for compassionate release the severity of the defendants' [] sentences[.]"); *see also Untied States v. Kratsas*, DKC-92-0208, 2021 WL 242501, at *4 (D. Md. Jan. 25, 2021). And, in his supplement, Gallagher argues that his sentence "was increased more than three-fold based on the now discouraged and highly critical career offender and 851 provisions." ECF 71 at 10.

As mentioned, Gallagher qualified as a career offender under U.S.S.G. § 4B1.2(a). A person qualifies as a career offender if the instant offense of conviction is a "controlled substance offense" or a "crime of violence," as defined in U.S.S.G. § 4B1.2(a) and (b). The defendant must have committed the instant offense when he was at least 18 years of age. In addition, the defendant must have two separate prior qualifying felony convictions, for either a crime of violence or a felony drug offense. U.S.S.G. § 4B1.1(a); *see also* § 4B1.2(c).

Gallagher has three separate prior felony convictions for a controlled substance offense. *See* ECF 51, ¶¶ 37, 44, 45; ECF 61 (Statement of Reasons). And, because defendant's instant offense is a controlled substance offense, Gallagher qualified as a career offender under U.S.S.G. § 4B1.1. Furthermore, no change in the law impacts the defendant's career offender status.

Gallagher's criminal convictions resulted in a staggering criminal history score of 25 points, which establishes a criminal history category VI. In other words, even without regard to his career offender status, defendant had a criminal history category of VI. ECF 51, ¶ 49.

Defendant received a Guidelines sentence of 85 months of imprisonment.  ECF 60.  It was a reasonable sentence.  He has failed to establish an extraordinary and compelling reason for his release on the basis of the length of his sentence.  Thus, given the circumstances present here, the Motion fails.

Even assuming, *arguendo*, that Gallagher has demonstrated extraordinary and compelling circumstances for compassionate release, an analysis of the § 3553(a) factors does not support release.  In my view, a balancing of the § 3553(a) factors indicates that defendant's release from prison is not warranted at this time.

The coronavirus is not "tantamount to a 'get out of jail free' card."  *United States v. Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.).  When a court finds extraordinary and compelling reasons for compassionate release, relief is warranted under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of the factors set forth in 18 U.S.C. § 3553(a).  *See Bethea*, 2022 WL 17588045, at *5; *High*, 997 F.3d at 186; *see also United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam).  These factors include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.  *High*, 997 F.3d at 186.  The Court must also consider the factors set forth in 18 U.S.C. § 3142(g), including the nature and circumstances of the offense, the history and characteristics of the defendant, and the danger that release would pose to any person or the community.  U.S.S.G. § 1B1.13(2).

As the government observes, Gallagher's crime of conviction was a serious one. During the investigation and arrest of defendant, law enforcement agents seized large quantities of marijuana, THC, a firearm and ammunition, and a significant amount of U.S. currency. ECF 73 at 29. And, the Statement of Facts set forth in the Plea Agreement, to which defendant agreed, established that the defendant possessed the marijuana and THC with the intent to distribute the Schedule I controlled substance. ECF 46 at 11. In sum, the investigation revealed that Gallagher was a significant source of supply of marijuana and other illegal substances in Maryland.

Furthermore, defendant's criminal history is quite substantial and reveals a serious pattern of recidivism, dating to when the defendant was just fourteen years old. ECF 51, ¶ 30. Gallagher has eleven adult convictions in State court. *See id*. ¶¶ 36-46. Several of those convictions involved felony drug offenses. *See id*. ¶¶ 37, 39, 44, 45.

A review of Gallagher's criminal history makes plain that the criminal justice system has repeatedly treated defendant with leniency. On other occasions, however, he received serious sentences. Neither approach worked in leading Gallagher to change his conduct. Rather, he continued to engage in criminal activity, which culminated in his federal prosecution in this case. And, defendant committed the offense at issue here while on parole for a felony drug offense committed in 2013. *Id.* ¶ 48. In fact, Gallagher violated the terms and conditions of his court supervision in nearly every conviction that he has incurred. *Id*. ¶¶ 36-41, 44, 45. The Court remains troubled by the severity of defendant's offense of conviction, coupled with his criminal history and his repeated failure to conform his conduct to societal expectations.

To be sure, Gallagher's behavior while in BOP custody is an important indicator of whether he remains a danger to the community. *See* 18 U.S.C. § 3582(c)(1)(A)(ii). In a supplement to his Motion, Gallagher notes that he has exhibited "excellent conduct in prison, and has only one minor

disciplinary infraction for "tearing a towel." ECF 90 at 23.  He has also completed a Drug Abuse Education Course.  ECF 91-1 at 5.  Additionally, his brother submitted a letter to the Court in support of his release.  ECF 91-1 at 13-14.

The Court applauds Gallagher for his positive efforts to return to society.  But, "rehabilitation alone cannot serve as a basis for compassionate release." *Davis*, 2022 WL 127900, at *1.  In my view, the sentencing factors set forth in 18 U.S.C. § 3553(a) militate against defendant's release at this time.

## V.     Conclusion

Even if Gallagher were eligible for compassionate release, a reduction of sentence is not warranted at this time, in light of the factors set forth in 18 U.S.C. § 3553(a).  In sum, the Court remains troubled by the serious nature of defendant's offense of conviction and Gallagher's serious criminal history, reflecting his repeated failure to conform his conduct to societal expectations.

Simply put, this is not the "grievous case[]" warranting compassionate relief.  *McCoy*, 981 F.3d at 287.  A reduction in the length of the sentence would not adequately reflect the seriousness of the defendant's crime nor promote respect for the rule of law.  Consequently, the Court denies the Motion, without prejudice.

An Order follows, consistent with this Memorandum Opinion.

Date: December 21, 2022                    _____/s/_____

                                           Ellen L.  Hollander
                                           United States District Judge

31